In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA,**
INDIANAPOLIS DIVISION

| | |
|---|---|
| DENNIS D. KOST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **CAUSE NO. 1:04-CV-1800-SEB-VSS** |
| ) | |
| JO ANNE B. BARNHART, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## E N T R Y

The plaintiff, Dennis D. Kost, seeks judicial review of the decision of the defendant Commissioner of Social Security denying his application for disability benefits under the Social Security Act ("SSA"). The standard of review is a deferential one: courts must uphold decisions of the Commissioner if her factual findings are supported by substantial evidence in the record and no material errors of law have occurred. 42 U.S.C. § 405(g); *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla but less than a preponderance of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it amounts to substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). Courts review the legal basis for the Commissioner's decision *de novo*. This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability

decisions:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(3)(A). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process. 42 U.S.C. §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. §§ 404.1520 and 416.924. If disability status can be determined at any step in the sequence, an application will not be further reviewed. *Id.* At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled. Second, if the claimant's impairments are not severe, then he is not disabled. A severe impairment is one that

"significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545 and 416.945. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If a claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables correlating age, work experience, education, and RFC with predetermined disabled or not-disabled findings. 20 C.F.R. §§ 404.1569 and 1569a. If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then use of the grids is prohibited and a vocational

3

expert must testify regarding the numbers of jobs in the economy for a person with the claimant's vocational and medical characteristics. *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grid result, however, may still be used as an advisory guideline in such cases. 20 C.F.R. § 404.1569.

Applications for disability benefits are given initial and, if requested, reconsideration review by medical and vocational experts. If the claimant is dissatisfied with the decisions, he may request a hearing before an administrative law judge (ALJ).[1] A claimant who is dissatisfied with the ALJ's decision may request the Social Security Administration's Appeals Council to review the decision. If the Appeals Council either declines to review or affirms the ALJ's decision, the claimant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review an ALJ's decision, the ALJ's decision becomes the final decision of the Commissioner that is given judicial review.

Mr. Kost applied for benefits on August 14, 2001, claiming disability since May 3, 2001 because of a "damaged heart" that "significantly limits stamina and energy." (R. 45). An ALJ denied his request on December 11, 2003. (R. 11-24). After the Appeals Council denied Mr. Kost's request for review on October 8, 2004, (R. 5), he filed the present action for judicial review on March 7, 2005.

---

[1] For benefit applications filed in Indiana, the initial and reconsideration reviews are performed by an agency of the state government — the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration — under arrangement with the Social Security Administration. 20 C.F.R. Part 404, Subpart Q. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the Social Security Administration.

Mr. Kost was 53 years old at the time of the ALJ's decision and he is a college graduate. His past relevant work was at a grain processing plant in various positions: from 1986 to 1991, Mr. Kost was mill superintendent; from 1991 to 1993, he was production manager; and from 1993 until he quit work in 2001, he was plant manager. (R. 46).

Mr. Kost suffered a heart attack, an inferior myocardial infarction, in 1993. (R. 139, 141). He recovered and returned to work. (R. 139). Sheila M. Gamache, M.D., a cardiologist, began seeing Mr. Kost in September 1994, about a year after this heart attack, and has been treating him since then. Dr. Gamache stated that Mr. Kost's heart attack only mildly weakened his heart muscle — his pumping efficiency, or ejection fraction, was 44 percent — and that he was doing very well, requiring infrequent visits. (R. 139). In early 2001, however, Mr. Kost began to feel fatigued after work and he returned to Dr. Gamache. His poor performance on a stress test led Dr. Gamache to conclude that, sometime between 1999 and 2001, Mr. Kost experienced another heart attack, this time an anterior myocardial infarction, that damaged his heart muscle. She stated that Mr. Kost's suffering a second heart attack with significant deterioration but without accompanying angina or other warning symptoms is an event that occurs in a significant percentage of patients with progressive coronary heart disease. (R. 140). Mr. Kost's ejection fraction had declined from the 44 percent after his first heart attack to 35 percent after his second. (R. 141). A heart catheterization performed on May 8, 2001 showed that Mr. Kost also had significant progression of his hardening of his arteries, his atherosclerosis. (R. 140).

On May 17, 2001, Mr. Kost underwent triple-bypass surgery in an attempt to restore

blood flow to the weakened muscle of his heart in order to increase its pumping efficiency. (R. 125). Dr. Gamache stated that, although most bypass patients experience immediate improvement after surgery, the stress on Mr. Kost's already-weakened heart and his seriously-diseased arteries reduced his ejection fraction dropped to 10 to 15 after the surgery. (R. 141-42). In light of Mr. Kost's serious progressive dysfunction, despite aggressive medication treatment and surgery, and the high-stress nature of his job, Dr. Gamache recommended that he be off work in order to "give his heart a chance to rest, him a chance to go through rehab, a chance to exercise, take his medicine, watch his diet, and do everything to actually help his heart muscle rest and get him functionally feeling better." (R. 143). Mr. Kost left work. In January 2002, after absence from work, an aggressive medicine regimen, and a rehabilitation program, a stress test revealed that Mr. Kost's ejection fraction had increased to 28 percent. (R. 144). Dr. Gamache attributed his progress in part to the ability to rest without the physical, mental, and emotional demands of his high-powered job. (*Id.*).

A year later, on January 2, 2003, Mr. Kost was admitted to the hospital with chest discomfort. He was found to have non-sustaining ventricular tachycardia that Dr. Gamache noted was another manifestation of his weakened heart muscle and poor ejection fraction due to his coronary disease. (R. 146). A cardioverter difibrillator was implanted to treat the tachycardia. (R. 146, 148). According to Dr. Gamache, when a patient has an ejection fraction as low as Mr. Kost's, non-sustained ventricular tachycardia "puts one at very high risk for sudden cardiac death" and "those risks increase with sustained physical demands or sustained emotional stress." (R. 146-47). Although Dr. Gamache opined that Mr. Kost's chest pain and discomfort that sent him to the hospital was not cardiac in origin and that, in general, he did not

suffer cardiac pain or shortness of breath when he stayed within his prescribed limits, Dr. Gamache stated that he still has an area of his heart muscle that cannot be bypassed or helped with a balloon and that is at risk for recurrent heart attack. Adding the nonsustained ventricular tachycardia, Dr. Gamache opined that Mr. Kost is at high risk for sudden cardiac death. (R. 147-48). For these reasons, Dr. Gamache's opinion is that Mr. Kost cannot return to work. (R. 148).

At step one of the sequential evaluation process, the ALJ found that Mr. Kost has not engaged in substantial gainful activity since his stress test on May 3, 2001. (R. 15, 23). At step two, the ALJ found that Mr. Kost has the following severe impairments: coronary artery disease, cardiomyopathy, and left-knee bursitis. (R. 15, 23). At step three, the ALJ found that Mr. Kost's impairments, singly and in combination, do not meet or equal any of the listings of impairments. (R. 16, 23). For the purposes of steps four and five, the ALJ found that Mr. Kost retained the residual functional capacity to perform sedentary work with the following restrictions: no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs; never climb ladders, ropes, or scaffolds; and he cannot be exposed to high-energy electrical or magnetic fields. (R. 17, 23). Because he found that Mr. Kost's past relevant work as plant supervisor was performed at the light exertional level, the ALJ found, at step four, that Mr. Kost could not perform his past relevant work. (R. 22, 23). Based on the testimony of a vocational expert and using the grids as a framework, the ALJ found, at step five, that there are a significant number of jobs that Mr. Kost can perform in the economy and that he is, therefore, not disabled. The Appeals Council denied Mr. Kost's request for review of the ALJ's decision. (R. 5).

Mr. Kost challenges one aspect of the ALJ's decision: his rejection of Dr. Gamache's opinion that low-level stress will exacerbate Mr. Kost's heart condition and put him at risk for sudden cardiac death. As noted above, Dr. Gamache's opinion is that, given Mr. Kost's progressive cardiac deterioration that cannot be further surgically treated, his low ejection fraction, and his ventricular tachycardia, he is at high risk for sudden cardiac death with "sustained physical demands or sustained emotional stress" despite the infrequency of symptoms and the placement of a defibrillator. She specifically noted that stress induced angina, (R. 184), that emotional factors contribute to the severity of Mr. Kost's subjective symptoms and functional limitations, (R. 185), and that Mr. Kost was incapable of even low-stress jobs, (*id.*).

The ALJ provided only brief discussion of Mr. Kost's stress-tolerance and Dr. Gamache's opinion thereon:

> As to factors that precipitate and aggravate the claimant's condition, Dr. Gamache stated that she thought stress would precipitate angina and that he is incapable of even a low-stress job (EX. J at 2-3). She based these conclusions upon a progression of the claimant's congestive heart failure and the frequency of his angina, and she said that emotional factors contribute to the claimant's symptoms and functional limitations (EX. J at 3). As I previously noted, I find no corroboration of these factors in the medical records.

(R. 19). There is no previous discussion of the effect of stress on individuals with Mr. Kost's conditions.

> Moreover, an opinion that the claimant cannot return to his past work is not inconsistent with this decision. Dr. Gamache recently qualified this opinion, noting that the claimant was working "so many hours a week in such high-stressed, high-powered jobs he couldn't rest, he never had time to exercise, he didn't have time to eat properly" (EX. 6F at 8). Dr. Gamache made further reference to the claimant's "high-powered job" (EX. 6F at 9). These references establish that the claimant's performance of his actual job was harmful, but it does not establish an inability to perform other work.

8

(R. 20).

> She stated that the claimant's stress induced angina and that the claimant was incapable of performing even low stress jobs.
>
> \*      \*      \*
>
> In evaluating Dr. Gamache's submissions, I note that she maintained that he experienced chest pain, anginal pain, shortness of breath, fatigue, weakness, nausea, and dizziness  (EX. J. at 2).  She also purported to rely upon a disturbance of his attention and concentration (EX. J at 3), but I have noted the lack of corroboration in the record.

(*Id.*).  Again, the ALJ included no discussion of the relationship between stress and Mr. Kost's severe cardiac impairments and there is no discussion of the absence of corroboration for Mr. Kost's reported lack of attention and concentration.

Dr. Gamache is a board-certified cardiologist and based her opinion on her long-term care and treatment of Mr. Kost, the objective medical findings she interpreted regarding his condition, and on her expertise and experience as a cardiologist.  The ALJ relied on the testimony and opinion of Dr. Farber, the medical expert at the hearing, who had not examined Mr. Kost and did not have the benefit of Dr. Gamache's detailed deposition explaining Mr. Kost's conditions and her opinions thereon that was submitted after the hearing.  (R. 137). Under the Commissioner's own regulations, a physician's specialization and whether he treated the claimant are important in determining the weight to be given to the physician's medical opinion.  20 C.F.R. § 404.1527(d)(2)(i) and (d)(5).  In this case, Dr. Farber is board-certified in internal medicine and pulmonary disease, (R. 224), and neither treated nor examined Mr. Kost. The ALJ offered no explanation or rationale for crediting Dr. Farber's opinion over Dr. Gamache's on the issue of stress-induced risks to Mr. Kost's health.

9

In addition, Dr. Farber did not specifically refute Dr. Gamache's opinion that Mr. Kost cannot tolerate even low-level stress. Dr. Farber testifed, "Well, *before* I had Dr. [Gamache]'s RFC of April [2, 2003,] it was fairly clear that at least in the record there was nothing that would have precluded sedentary work." (R. 229) (emphasis added). Dr. Farber did not directly address Dr. Gamache's opinion regarding the effect of low-level stress on Mr. Kost's condition, confining himself to the exertional demands of work, and, as noted, he did not have Dr. Gamache's detailed deposition regarding her opinion at the time of his testimony.

The ALJ did credit Dr. Gamache's opinion that Mr. Kost cannot tolerate the higher-level of stress he experienced in his past relevant work, thereby conceding the negative impact of stress on his physical impairments. However, the ALJ failed to include any effect of stress levels in his hypotheticals to the vocational expert thereby rejecting entirely the issue of stress as an exacerbating factor without any explanation or citation to evidence in the record. There is not substantial evidence in the record to support the ALJ's finding that job-related stress is not a factor in Mr. Kost's impairments or limitations therefrom.

The Court of Appeals for the Seventh Circuit has clearly addressed the relationship of psychological stress on a claimant's impairments. In *Schmidt v. Sullivan*, 914 F.2d 117, 118-19 (7th Cir. 1990), the Court wrote:

> The administrative law judge who ruled that the plaintiff is not disabled was persuaded that the plaintiff could return to the sorts of job he held before he stopped working in 1986. The fact that the plaintiff continues to play handball appears to have weighed heavily with the administrative law judge. It is indeed difficult for a lay person to understand how a person could suffer from disabling heart disease yet play handball for forty minutes every week. But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. *Wilkins v. Sullivan*,

> 889 F.2d 135, 140 (7th Cir.1989); *Bauzo v. Bowen*, 803 F.2d 917, 926 (7th
> Cir.1986); *Smith v. Director*, 843 F.2d 1053, 1058 (7th Cir.1988) (dissenting
> opinion); *Williams v. Bowen*, 664 F.Supp. 1200, 1208 n. 17, 1209 n. 18 (N.D.
> Ill.1987).  The medical expertise of the Social Security Administration is reflected
> in regulations; it is not the birthright of the lawyers who apply them.  Common
> sense can mislead; lay intuitions about medical phenomena are often wrong.
> Attacks of angina pectoris-the chest pains that are symptoms of coronary artery
> disease-can be brought on by psychological stress as well as by physical exertion,
> *The Heart: Arteries and Veins* 1174 (Hurst, *et al.*, eds.1978), and people's
> sensitivity to different forms of strain differs.  *Id.*  Moreover, "angina pectoris
> provoked by emotional tension will sometimes last longer than angina pectoris
> provoked by effort because one cannot control emotions as easily as one can
> control physical activity."  *Id.* at 1175.  Apparently Mr. Schmidt reacts worse to
> the kind of psychological stress that he experienced when he held responsible
> managerial positions than he does to the physical exertion involved in a slow
> game of handball.  So at least the evidence of his treating physician indicates, and
> there is no contrary evidence. The award of benefits to a person disabled because
> the emotional stress of working would exacerbate his heart condition would not
> even be novel.  *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir.1984).

The Commissioner failed to address the clearly-applicable holding in *Schmidt* despite Mr. Kost's heavy reliance thereon in his brief.  The ALJ in this case rejected Dr. Gamache's opinions regarding stress primarily on the basis of the evidence of his physical activities, *e.g.*, his improved exercise tolerances, his improving ability to endure walking, his ability to work in his yard and garage, all without signs of angina, fatigue, or other cardiac-related symptoms. However, as the *Schmidt* Court held and Dr. Gamache opined, psychological factors, such as stress, can often have greater and lesser-controllable effects on a cardiac patient's health than physical stress and exertion.  The ALJ's decision is notable for its lack of relevant analysis, evaluation, or discussion of this important aspect of Mr. Kost's impairments.

The ALJ further misunderstood Dr. Gamache's opinion that emotional factors contribute to Mr. Kost's impairments.  Dr. Gamache reported on a questionnaire that Mr. Kost's physical symptoms do not "cause emotional difficulties such as depression or chronic anxiety," and that

11

emotional factors do "contribute to the severity of [Mr. Kost's] subjective symptoms and functional limitations." (R. 185).  The ALJ found a contradiction here which caused him to discount her opinions.  There is no contradiction.  Dr. Gamache noted that Mr. Kost's cardiac and other impairments have not caused him to suffer depression, anxiety, or other emotional difficulties.  However, she also noted that "emotional factors", such as job-related stress — not caused by or related to his physical condition — can exacerbate his condition and threaten sudden cardiac death, *i.e.*, emotional factors such as stress contribute to the severity of his symptoms and limitations.

There is not substantial evidence in the record to support the ALJ's finding that Mr. Kost can endure low-level stresses involved in sedentary work.  In addition, because the ALJ failed to include stress limitations in his hypotheticals, substantial evidence in the record does not support the vocational expert's testimony that jobs exist in the economy that Mr. Kost can perform.  Therefore, the decision of the Commissioner will be reversed and this case will be remanded to the Commissioner for re-evaluation of Mr. Kost's stress tolerance, its effect on his residual functional capacity, and the number of jobs, if any, existing that he can perform.

Date: March 28, 2006

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

J. Frank Hanley II, P.C.
jfrankhanley@iquest.net

Thomas E. Kieper,
Assistant United States Attorney
tom.kieper@usdoj.gov